Pandem cases under page 24-1209, Irelia Capital Master Illuminis versus Republic of Argentina. Let's just wait for the crab to get out of the way. Okay, Mr. Englert. May it please the court. My name is Roy Englert. I'll be speaking this morning on behalf of all the plaintiff appellants, and I'd like to reserve five minutes for rebuttal. Subject, as always, to the court's questions and guidance, I'd like to organize my presentation by first addressing all the non-merits issues and then turn to the merits questions. So I'll start, of course, with the no-action clause issue that is the basis for Judge Preston's ruling. No-action clauses are not unusual. Typically, and in this case, they state a broadly worded prohibition of actions by individual holders unless certain steps are taken involving the trustee. Sir, was there a reason why you and your colleagues, or your clients, elected not to comply with the no-action clause this year? Was there something that could not have been satisfied? I appreciate why you believe you're within 4.9, I get it, but just wondering, was there a reason why, for belt and suspenders even, you didn't try to comply with 4.8? There is not a reason in the sense that there would have been any problem with compliance, but these are standard instruments, and it has been understood throughout many, many, many decades of indentures that the way a no-action clause works is that it has a carve-out for individual actions for payment. And because we read Section 11 as consistent with that carve-out that is always in the no-action clauses, it would not have occurred to a reasonable investor that there was any reason to pursue this through the trustee. And just a related question, please, sir. To the extent that you thought that Argentina's failing was in failing to give that 1993 information, would that have been within, that wouldn't have been within 4.9, that would have been within 4.8, correct? The reason you believe that 4.9, by way of Section 11, was applicable was because it was the failure to make payments. But if the issue was the failure to give the information, would that have been subject to the no-action clause? A declaratory action on just the failure to give information? No. An action for money paid is within the exception. Understood. All right. Thank you. But you were independently suing just to get access to 1993 numbers. You really wanted a payment. That's correct. Here, with regard to the conventional bonds issued in 2005 and 2010 to replace defaulted bonds, the broad prohibition is Section 4.8 of the indenture and the exception is 4.9. With regard to the novel GDP securities issued in 2005 and 2010, the exception is still Section 4.9 of the indenture, but the broad prohibition and a cross-reference to Section 4.9 are found in a different document, Section 11 of the Global Security. As the court is well aware, the key language of Section 11 is the first 45 words. Except, as provided in Section 4.9 of the indenture, with respect to the right of any holder of a security to enforce the payment of any amounts due hereunder on any payment date, as this security may be amended or modified pursuant to paragraph 22. That text fully and strongly supports plaintiff's position that was misread by the district court. The phrase says, take Section 4.9 of the indenture and apply it to the right of any holder of a security to enforce the payment of any amounts due hereunder. And if you go and look at Section 4.9 of the indenture, it says you can proceed on a claim for principal or interest. So, shouldn't I apply that principle to the right of any holder of a security to enforce the payment of any amounts due under the Global Security? No, for a reason having to do with the text, but for an even broader reason as well, which is that would make this entire first 45 words of Section 11 meaningless surplusage. It would mean there is no payment right on the global securities, because Argentina's position... Well, unless the exceptions are met, unless the requirements are met. But according to Argentina, these are not principal and interest. They're wrong about that, by the way, but according to Argentina, these are not principal and interest. Except the front page of the Global Security says you're not getting payments of principal or interest, right? I'm sorry, Judge Feiglin. It's right on the front and first page of the document itself. The Global Security document says specifically what you're not getting is payments of principal or interest. Well, to be precise, it says... Yes, on nominal amounts. On notional amounts. Exactly. It says you're not getting principal and interest on the notional amount. Right. And again, everybody knows that this is not principal and interest on the notional amount. Whether it's principal and interest is a separate question we've briefed, but we don't need to get... The court shouldn't need to get to that question, because for Section 11's exception to the no action clause to have any meaning at all, it has to apply to... That's true. I mean, the Global Security... Two things, right? The GDP-linked securities are also governed by the indenture, so you might acknowledge an exception that exists in the indenture, even though it's not very meaningful, it's just the securities. And then the securities can be modified, right? It's not impossible that the parties might agree to modify them to cash out the principal and interest or something to that effect, right? So it might be that Section 4.9 would have an effect, and it wouldn't be that meaningful, I agree, but maybe that means it would justify a clause that's not even a complete sentence in the entire document. But why does it have to be more meaningful than that? Well, with regard to Your Honor's first point, Section 1A of the Global Security says in case of any conflict between these instruments, the Global Security prevails over the indenture. With regard to the modification point, these are expensive, publicly traded debt securities that people expect to have value. If we really took the possibility that Argentina could simply modify in the future and said, that's the whole reason for Section 11, that would shock the marketplace. It is not... That's not the whole reason for Section 11, right? That's the reason for the qualifying clause that... The main action of Section 11 is you can't make, you can't sue, right? It's just, there's a clause that doesn't accept it. That's right. The no action clause and the exception are combined. So, I take your point that it doesn't seem that meaningful that way. But if, under your interpretation, why reference Section 4.9? The Section 4.9, the only content it provides is the limitation to principal and interest. No, Your Honor, that's not true. Section 4.9 refers to the right which is absolute and unconditional. Those are strong, positive words for bondholders or securities holders. To receive payment of the principal and interest at the stated maturity date for such payment expressed in such debt security and an institute suit for the enforcement of such payment. And such rights shall not be impaired without the consent... It goes entirely about principal and interest. Because it's in the indenture, it is about principal and interest, which is the main subject. There are two forms, form of global security and form of bond attached to the indenture itself. And the form of global security refers to any payments here under. But just with respect to Judge Menashe's question about what does this clause reference to 4.9 do besides restricted principal and interest? It does a lot of things. There's a lot of positive bondholder, shareholder, security holder rights stated in 4.9. 4.9 is pretty short. I mean, we can read it. Now it says in Section 4.8, each holder of debt security shall have the right, which is absolute and unconditional, to receive payment of the principal of and interest on its debt security on the stated maturity date for such payment expressed in such debt security as such debt security may be amended or modified pursuant to Article 7 and institute suit for the enforcement of any such payment. And such right shall not be impaired without the consent of such holder. It does have that parenthetical clause that says absolute and unconditional, but what it's talking about is the right to receive payment of the principal and interest. It seems to me if the global security didn't want to have that limitation, why would it incorporate Section 4.9? Why wouldn't it just say you have the right to sue for payments due on these securities? Because, again, Section 4.9 provides a lot of additional words of assurance about how— What are the additional words of assurance? Just the absolute and unconditional? No, it's also such right shall not be impaired without the consent of such holder. It's also at the stated maturity date. But what's— It's also— Wait, the first thing is, what's such right? What's the such record? Such right. The absolute and unconditional right to receive payment and to bring the lawsuit. To receive payment of principal and interest. So it's just referencing back to the right to receive principal and interest, right? Yes, but Section— First of all, the global security, the form of global security attached to the indenture talks about any payment here under it. So it would be very strange to read the reverse of the form of the global security and think that it's limited to principal and interest. Second, Section 11 itself says, except as provided in Section 4.9 of the indenture, no comma. Yeah, I mean, that's the thing. When I read it naturally, I put a comma there. When you read it, you paused there, and I thought, there's the comma. If there's a comma there after indenture, then it—I mean, it makes sense that it's saying, except as provided in 4.9 of the indenture, we have a no-action clause exception with respect to the right of any holder of a security to enforce payment here under. You have to meet the requirements. That is to say, it's not—it is a no-action clause that carves out no new exceptions. But you say it's significant that there's not a comma there. It's significant, as the English part determines, that there's not a comma there. I mean, just as it's significant as the fact that the words, as provided in Section 4.9 of the indenture, are there. But it uses the words, the right of any holder of a security to enforce the payment of any amounts due here under. What can those words possibly mean if they don't mean that, by virtue of that language, there is a right under Section 4.9? I don't get the significance of a comma. Maybe I just don't like lots of commas. But just isn't the natural way to read that clause, except as provided in Section 4.9 of the indenture, and with respect to the right? Meaning, take Section 4.9 of the indenture and apply it to the right of any holder of a security to enforce payment of any amounts due here under, right? That's what with respect to means, right? It doesn't say, alter Section 4.9, except as 4.9 as would be applied in different contexts of the right to recover. I mean, it doesn't indicate that we're modifying 4.9, right? It says, take Section 4.9, apply it to the right of any holder of a security to enforce the payment of any amounts due here under, right? But the words, any amounts due here under, play a major role in interpretation of this clause. It doesn't say principal and interest. Throughout the global security and the form of global security, when they want not to refer to principal and interest, they change the phrase to any amount due here under. And that's the function of any amounts due here under in Section 11, is to say we're talking about amounts due under the global securities, which by hypothesis are not principal and interest. Again, we think they are, but by hypothesis they're not principal and interest. So to refer to any amounts due here under has to have some function, and the only imaginable function of using that phrase in Section 11 is to say 4.9 applies to any amounts due here under. So if the contract author wanted this only to apply it to principal and interest, how do you think it would have been written? I'm sorry, I didn't hear you. If they actually wanted to enact Argentina's interpretation, that is to say, take the principal and interest limitation and apply it to the securities, how would it be written differently? It would have said, except as provided in Section 4.9 of the indenture with respect to the right of any holder of security to enforce the payment of principal and interest on anything it states. Or simply, it also could have been simply left out altogether. That clause signifies we are modifying the scope of Section 4.9 to enforce the payment not only of principal and interest, but of any amounts that are due under these securities. I'm sorry, Your Honor. You're saying that that clause, which seems to be, I was describing as a direction to take 4.9 and apply it to the amounts due, you're saying it's actually a modification of 4.9. No, I'm saying it's taking Section 4.9 and apply it to any amounts due here under, because any amounts due here under are covered by 4.9. That is an adaptation. I'm not sure it's a modification, but it's an adaptation of Section 4.9 to the different security. It's a natural modification of Section 4.9 to the different security. And again, if it doesn't mean what I say it means, there's no function here at all with regard to the point Your Honor made about the modification. What would be barred by the no action clause under your interpretation? An action that's not for payment. An action that is a declaratory judgment. An action that is for anything other than the payment of what the total result. An amount to enforce a pari passu clause might be, but it might not be. But ultimately, in any kind of claim you're making, it's going to be to enforce payment, right? So if you have some kind of systematic claim that the republic is miscalculating GDP or doing some kind of shenanigans with all of its calculations and so on, that is still a suit to enforce payment, right? It depends on what the complaint says. But that could have implications for everybody else, couldn't it? It creates issues for everybody else. The main exception of Section 11 that we were emphasizing is you can't sue without doing the notice of provisions, right? That's got to be the main point of Section 11. So if, in fact, that parenthetical clause at the beginning says the exception applies to any suit to enforce a payment of any amount due here under, doesn't that basically mean that any suit by a holder would be able to proceed without the notice provisions? Any suit for payment, yes. That's how 4.8—forget the global security problem. What would the work of the main action of Section 11 do? What are the suits that would be barred that you'd have to go through the notice provision for? An action for reformation of the contract. An action for a declaratory judgment. An action that required specific performance of some other clause. Those would be not for payment. But remember, let's forget the global securities problem. Look at 4.8 and 4.9. This is how they work together with respect to the bonds. To say that this is not how 4.8 and 11 work with respect to global securities, because of speculation about what might or might not be a suit for payment, spills over into 4.8 and 4.9. You can't do what those mean. The interest on the bond are automatic. You put in a principal. Your principal is there with Argentina. That's the debt. You might be entitled to the principal being returned. You get interest on a regular schedule. The GDP linked securities give you these contingent payments that depend on the performance of the Argentine economy and whether it meets benchmarks, and whether the GDP growth is a certain amount year over year, and so on. A claim for payment of the GDP linked securities doesn't necessarily implicate all of these systemic questions about the way the Argentine economy is functioning and how all these calculations are made. So doesn't it stand to reason that maybe that's something where you might proceed to the newest requirements where it's principal interest, because they're narrowly defined and relatively automatic? It might be conceivable in the abstract. But again, the way no-action clauses work, the quadrant case from the New York Court of Appeals, the model indentures cited in the quadrant case in the New York Court of Appeals, they always have this structure. No-action clause, exception for payment. And the exception is always for payment. And Argentina and Judge Presta read this particular exception as being one that has no meaning. It's not for payment. Harmless error, you can always go through the trustee. No harm, no foul. But there's no reason for a bondholder, used to how indentures work, not to think that suits for payment are carved out for this instrument as they are for every other instrument traded in the market. By the way, with regard to Your Honor's point that this depends on calculations, let me add, it's a different issue, but let me add that that does not defeat that these are interest. We point out dictionary definitions in our brief about the definitions of interest, including contingent or uncertain payments. The recent opinion of the Third Circuit in the Hertz bankruptcy case, Judge Ambrose explained why contingent make-all payments are of interest according to that court. So there's lots of reasons to think that if I'm wrong on the first point, I'm right on the second point. It is principle of interest. But I'm not wrong on the first point because it's a simple structure. But what about the point earlier that we heard that on the first page of the Books of Security, it said that this is not principle of interest? On the notional amount. But isn't the contract telling us it's not principle of interest? No, absolutely not. And Argentina itself referred to it as interest in document and coupons, in document after document after document. All the legend says is it's not interest on the notional amount, which is correct. It's not interest on the notional amount. Not interest on what? It's interest on the money invested. It's contingent interest on the money invested by whoever owns the instruments, but it's interest on the money invested. But it's not a payment for the use of the money, right? It is a payment for the use of the money. Based on the performance of the economy. It's a contingent payment for the use of the money. Argentina raised money after its massive default through the 2005 and 2010 bond instruments by getting people's money so that it could run its economy and giving them a sweetener so it would pay them if the economy did well. So whenever there's an investment, no matter how the payout is structured, it's always interest because the purpose of selling the security in the first place was to have the use of money? Whenever is a broad word. Like if these securities just gave you a flat payment, regardless of the amount of your investment, you get like $5 a year or something, you would still say that's an interest payment. That could be interest, but it also might fall outside the standard dictionary definition of interest. And this one doesn't fall outside the standard dictionary definition, why? Because dictionaries account for the fact that it may be a contingent payment as well as a particular payment. Take a familiar example, floating rate mortgages. There's still interest even though you don't know until you know what the interest rate is on a particular date what the payment is going to be. You can have all kinds of different instruments that provide for variable interest. Your honor gave the hypothetical example of $5 no matter what. I think that still is interest, but if it's not, it's because it's not tied to any calculation. But this is tied to a calculation. Floating rate mortgages are tied to a calculation. Straight off interest, like the bonds governed by the indenture in 4.8 is interest. So again, we think that the English parts were quite right, and it's quite clear that this covers amounts due here under, and it creates an exception for direct action. If I think your argument as to the meaning is plausible, but I lack certainty as to its clarity, so if I think it's ambiguous, then what? I'm sorry? If I think it's ambiguous, then what? Well, under standard principles of your contract law, one looks to extrinsic evidence. So it would be a remand for an argument that's in the summary judgment record regarding extrinsic evidence? And how would that play out? What would you point to? Well, if it went back, there wouldn't be much to look to. One would look to negotiation documents. One would look to the prospectus and other roadshow documents. But most of all, one would look to what Argentina itself has said. And Argentina itself has always said, these are interest payments, which again, it's not my primary argument, it's my second argument, but again, either way you slice it, it cannot be that the first 45 words of Section 11 simply have no meaning at all. If I may, I'd like to turn to Argentina's non-merits alternative grounds for affirmance. I'll start with the argument made at pages 75 to 77 of the Red Brief, where Argentina would demand proof of a specific transfer of litigation rights before the holder could sue. I don't plan to spend much time responding to this one. These are publicly traded debts insurance, and it would revolutionize the secondary markets where billions of dollars worth of transfers occur daily if this court suddenly found such a new requirement. But fortunately, we don't need to look far for the answer. Same old Section 11 of the Global Security, page 1327 of the Joint Appendix, says the Republic expressly acknowledges, with respect to the right of any holder to pursue a remedy under the indenture, the GDP-linked securities authorization of the securities, the right of any beneficial owner of securities to pursue such remedy with respect to the portion of this global security that represents such beneficial owner's interest in the security, as if certificated securities had been issued to such a beneficial owner. So I think that's the answer to that one. I'll spend more time talking about the prescription clause, even though that argument by Argentina is equally bearable. That clause is Section 14 of the Global Security, and the key question is whether that clause shortens the statute of limitations from six years to five. Judge Prescott correctly answered this question in the negative in her opinion of February 15, 2022, involving the APE group, or what we call the Romano plaintiffs. And the English trial court, in paragraph 276 of its judgment, referred to a variation of the same argument as a hopeless contention. Now there are numerous grounds specific to the Romano plaintiffs and the Wasso plaintiffs discussed in pages 40 to 57 of our reply and cross-sectorly brief. Why Argentina's position on the prescription clause is wrong. We stand by all of them, but let me give one particularly powerful one. Section 2E of the Global Security, as the district court correctly pointed out, uses the phrase prescription period, and therefore sheds light on what prescription means in the indenture. And the substance of Section 2E is that after the prescription period, a holder no longer can look to the trustee for payment, but the holder can obtain payment from the Republic. The final 23 words of Section 2E are, the holder of any such security may thereafter, after the prescription period, look only to the Republic for any payment to which such holder may be entitled. If the prescription clause shortens the statute of limitations, Section 2E would be nonsensical. And Argentina has no answer to this devastating point. Look at pages 16 to 17 of Argentina's cross-appeal reply. There's nothing there. I appreciate that prescription clause argument, although I think we understand it. I'd actually like to just pivot slightly, if I may. Assuming we agree with you on the non-action clause division, and that's certainly not something I'm going to be able to tell you right now, do you believe we can decide as a matter of law the operation of the adjustment fraction, and the actual payments to which your clients are entitled? You seem to suggest we can. And I feel like there's still a deficit of 1993 data. But if you got everything you wanted, what did it look like? What do you think we could do as a matter of law as distinguished from sending something back to adjustment? You would say the no-action clause, the prescription clause, and the transferability argument are no bar to this lawsuit. And then with regard to the merits, you would say Argentina was required to publish the 1993 data. You would say that the constant factor approach doesn't work and the variable factor approach, our approach, the one specified in the contract, does apply. You would say that for... But you believe we can do that on this record? Absolutely. It's a very easy question. Really? The record is dense. It seems pretty tough, but okay. I understand. So it's a dense record, but if I may, I'll get to it in a moment, why it's really an easy question. But I want to complete my answer to Your Honor's question about what a remand, a maximal remand, would look like. I would not expect this court to calculate the damages, but I would expect this court to approve the use of the EMAE index, as the English courts did, as a proxy in the absence of contemporaneously published 1993 data. And let me tell you why that... But Jessica didn't seem too keen on doing that the first time around. She was wrong, with respect. Oh, okay. Let me explain both why our use of EMAE was proper and why it really, really matters for this court to address it. It's obviously perfectly before this court on appeal because Judge Preston ruled on it, and we've taken an appeal which brings all prior hearings before this court. It was used in the original complaint as evidence of what would have been shown just for the fourth quarter. Remember, Argentina published the numbers for the first three quarters of 2013, and it was only the fourth quarter that they didn't publish. Given the extreme closeness of the EMAE numbers to data that Argentina did publish over many, many years, it was the best someone could come up with to approximate as evidence of what the number called for by the contract would look like. Well, you're not saying that the EMAE data means that you automatically get a payment. That was just an allegation of fact as to why you think there's a breach because your 1993 numbers, you would be entitled to a payment, right? I don't assume anything's automatic, Your Honor, but I am saying that EMAE issues properly before this court because Judge Preston ruled on it in her first motion to dismiss the ruling, and she got it wrong for the reason I was trying to explain, which is it was used only as evidence. She thought it was being used as evidence. It was evidence of a breach because you're just saying here's, you know, plausible, factual allegations that would show that we would be entitled to a payment if the Republic used 1993 data. It's more than just an allegation of breach. It also bears on the calculation of damages. Let me explain why this is important. The English courts used EMAE and came up with 1.33 billion euros as their calculation of damages. They recognized that this is the best evidence in the absence of contemporaneously published data. They used it, and they reached a number. I don't expect this court to reach a number, but I do think this court can do everything short of reaching a number and send it back to Judge Preston to figure out that number. Using EMAE, why is this important? One, it's before the court because she ruled on it. Two, after the ruling in England, Argentina purported to publish numbers for the fourth quarter of 1993, and they dramatically, dramatically lowered the payout. And Argentina still hasn't paid the 1.33 billion euros that was ordered to pay by the English courts in the final judgment. So if there is not a remand with specific recognition that EMAE is admissible as evidence of what the right number would have been, then we're going to have yet another evasion tactic by Argentina. So this is really, in practical terms, quite, quite important for the court to reach. It is properly before the court, and we do think Judge Preston is right. So, so, sorry. So it sounds like you're saying it's admissible as evidence of what the right number should be, but maybe not decisive. But then you're saying that the Republic is publishing numbers that you think are deflated, and so actually it should be the right number because there's reason to suspect the official number. That they didn't... What is exactly the holding on the EMAE data that you think would be appropriate? That after this court reverses on our ability to bring the suit and says that the constant factor approach cannot possibly be what the contract means, that when Judge Preston applies our approach, it's okay to use the EMAE numbers in calculating damages. Okay. All right, thank you very much, Mr. Engler. May I say another few words about the basic merits issue? How about 30 seconds, and then we're going to hear from you on rebuttal. Okay. Look at pages five and six of Argentina's brief, how it describes the constant factor approach and the variable factor approach. Look at the definition of base case in the contract, which absolutely requires use of 1993 data each time for such adjustment in such a year. Their interpretation cannot possibly be right. It is not what the party is arguing for. It would be, again, an obvious violation in terms of the contract, as the English court said, and harmful to people who bought these securities and reliance on the terms. Okay, thank you very much, Mr. Engler. As I said, we'll hear from you again, but let's turn to the FLE, Mr. Gifford. Good morning, Your Honor. May it please the Court, Robert Gifford with Sullivan and Cromwell for the Republic of Argentina. We just said at the outset that these GDP securities warrants are not your typical debt securities. These were part of a restructuring that was done in 2005 and 2010, and my friend just indicated that Argentina has been abating payment. Argentina has paid more than $10 billion on these securities. I think you had it exactly right for much of Mr. Engler's argument. Judge Preska correctly held, under the plain language of the global securities, Section 11, that plaintiffs did not have a right to bring an individual action. It's important to look at what Section 11 says. It bars holders from bringing litigation that affects, disturbs, or prejudices the rights of other holders. Well, just one example, the obligation, whether Argentina does or does not have an obligation to produce GDP data from 1993 all the way up to 2034 is something that will affect other holders of the securities, and in fact, plaintiffs, in their brief at pages 46 and 47, say... Well, that's true, and I think I suggested that argument to Mr. Engler, but wouldn't that also be true of claims for principal and interest under the bond? Like, couldn't there be a claim about a miscalculation that might have implications for other bondholders because you might be challenging the way the Republic is calculating principal and interest? Because normally in debt securities there aren't such disputes like that, and in fact, plaintiffs themselves say that what we're talking about, and they said it this morning, competing interpretations of the global security, and those competing interpretations will affect other bondholders. They could have gone through the process that was specified in Section 11, and the reason why the process in Section 11 is there is the trustee is a fiduciary to all the holders. Plaintiffs here are only looking to make money for themselves, and so they're looking for a change in how this is being calculated and also what documents are contained. Yeah, but your point that they're trying to make money for themselves suggests that that is sort of the purpose of the CARBAP, like, one that's just about the individual interest of the security holder, and it's not about some kind of systemic administration of the program. That's why there's an exception to the notice required. But again, let's hear, what's the prejudice to other holders of the securities if they're allowed to just sue for payment on their own securities? Well, in fact, Your Honor, there's a dispute that was recognized in the market back in 2014, and it's in the record. The majority view of how you should construe these securities was the Argentine view, which we follow, the one-time adjustment, and that's reflected in HSBC. This is JA 1100 to 1102, where it says Argentina had the mainstream interpretation. Bank of America, JA 1106, 1119, Argentina's was consistent with the purpose of the indenture and what everyone understood about the security. So people were trading these securities and thinking about, well, how do you interpret the securities? Do you think there are some holders of the securities who would prefer Argentina's interpretation of that ad? I don't know one way or the other, but I do know that what they're seeking in this case is something that would clearly affect, disturb, and prejudice the rights of other holders. Let's focus, and I think this is the most important thing. Judge Prescott had it exactly right, and what plaintiffs do in their brief is they repeatedly cut out the key provision, which is acceptance provided in Section 4.9. Now, what plaintiffs are asking for is for this exception to swallow the broad rule, and that's clearly not correct. The with respect language is language of limitation, not expansion, and as I think one of the judges noted before, it doesn't say and with respect to. It says with respect to. That's a language of limitation, not a expansion, and such exceptions are to be... What do you mean by limitation? What is the language of limitation? It says apply Section 4.9 to payments due here under. What are you limiting? It just seems to me you're taking whatever 4.9 says and applying it. I agree 100%, and what it doesn't say, what plaintiffs would like it to say is it does not use the word, which is a defined term in the agreement called payment amount. It says amounts due here under, and if the drafts person was looking to say that you could bring a claim for the payment amount, it would have used the word payment amount, which was precisely what Judge Presta said in her decision correctly in terms of interpreting this provision. But if you wanted to limit it to principal and interest, then all you had to say was acceptance provided in Section 4.9 of the indenture, because then you would have gotten right back to Section 4.9, which limited it to payments of principal and interest. I think the reason that was done was twofold. Number one, it was the potential to amend these securities down the road, and the parenthetical comes right after with respect to... But the parenthetical is in 4.9 as well. Well, no. 4.9, in fact, well, 4.9 in the debt security goes on and talks about principal and interest. But in the actual indenture... Excuse me, sir. What I'm saying is the parenthetical of which you speak in Section 11 says, as such security may be amended or modified pursuant to Paragraph 22. I assumed you were simply tracking the language of 4.9 that says, as such debt security may be amended or modified pursuant to Article 7. So it didn't... To the extent... I think what you were arguing was that I shouldn't be worried about Section 11 being a nullity because there's always a possibility of an amendment. But that possibility of an amendment or modification was also put forward in 4.9, and that didn't suggest that 4.9 was a nullity. Well, that's different. 4.9 is in the debt securities. It's also 4.9 in the... 4.8 and 4.9 in the indenture. Mm-hmm. And what this provision, the exception, refers to 4.9 in the indenture. But 4.9 in the indenture says... 4.8 in the indenture says except it's provided in 4.8 and 4.8 and 4.9, and then it goes on. That's in a separate document. So clearly, all the draftsperson was attempting to do in Section 11 was make the point, well, payments that could be due relating to 4.8. So clearly, it's limiting language. It's not expanding language. And courts, including Judge Friendly in a decision we cite in our papers, make quite clear that when you use the word with respect to, that's narrowing the exception. It doesn't expand the exception. So what the plaintiffs would like to do here is, for example, ignore all the rest of Section 11, which talks about, well, is it a claim merely for payment, or is it a claim seeking to change the calculation method, what documents Argentina has to provide, what information it must provide, which is why we think clearly they should have gone through the trustee and they elected not to. But moreover, these sorts of... Well, why don't we then support their argument to say, well, look, we have this operative language about a distinction between just making a claim for payment on your own securities and doing some kind of systematic revision of the program? Because the language that comes after with respect to clearly must modify 4.9, and 4.9 only on its face talks about interest in principle and nothing else. You're convinced it's limiting, though. I just wonder why it couldn't be expanding and why it couldn't be analogizing the payments of any amounts due here under, which in this case would be the capitalized payment amounts, and analogizing them to principle and interest that are discussed in Section 4.9. If that were the case, the draftsperson would have used the word payment amounts, which is the fine term. But instead, they were broader. They said any amounts due here under, and the amounts due here under include the payment amounts. But that has to be with respect to the exception of 4.9, and then it takes you right back to 4.9 of the indenture, which only covers principle and interest. And the basic rule has always been in interpreting these types of clauses, which are, as my friend said, quite common, the broad language can't be swallowed up by the exception. The Quadrant case says, as a matter of New York law and set on construction, that you should interpret no-action clauses narrowly, which would point in favor of a broader exemption. I think, Your Honor, we've seen cases that I think are clear or go the other way, that these clauses need to be given their full construction, and that's what everyone intended. And there was nothing that would have stopped plaintiffs here from going through the trustee. In fact, in the English case, which has been referenced, the plaintiffs did go through the trustee. So, in this case, they knew this was an important provision, and they essentially elected to ignore it. And the language of the provision, as Judge Prescott correctly said, controls here, and the exception can't swallow the rule. In addition... What do I make of... You know, can I understand the context of the related documents? So, if the global note applies to Section 4.9 with respect to the principle of interest, it does seem like the authors of these documents thought they were doing something meaningful by specifying the scope with respect to the clause. Does that indicate that actually they did think that that was doing something to modify the scope of Section 4.9? No, I think as Mr. Ungar said, the global securities itself is the controlling document, and then you look to the other documents if there's something inconsistent with one, you look at that document. So, if what follows with respect to, you have to look at the language of Section 11. And with respect to its language, and courts have repeatedly held this, language of limitation... What if we think it's ambiguous? Then you can look at the force of delay in other documents and so on. So, let's say, I'm not saying I do, but let's say I think it's ambiguous. Could I then look at the way these with respect to clauses are operating in the related agreements and conclude that maybe, you know, it's not the way I would have done it, but maybe the author of these documents is using the with respect to language to modify the scope of Section 4.9. But I think the problem with doing that is that the instrument that we're talking about here, these warrants, these global-linked securities, are focused on,  what's the return of the economics of Argentina? They bear no resemblance to principle and interest the point Judge Fallah made. As was noted previously on the face of these securities, it says, only amounts payable are payments contingent on Argentina's GDP. Then it goes on to say that these are not, they're not entitled to principle or interest. And then the words principle or interest do not appear anywhere in the global security. Not once. Not once. They appear in these other documents in the bonds throughout those documents. But those words... Well, they don't appear in the global security because the GDP-linked securities aren't going to normally pay out principle and interest, right? They're going to pay out contingent payments and maybe that's why in Section 11 it says, amounts due here under, as opposed to saying with respect to principle and interest. Well, I understand maybe it doesn't support their second argument but that would support their first argument. But in the global securities, the contingent payments are defined as payments payment amounts. So if what was intended was to pick up payment amounts in the exception, they could have said, the drafter could have said, except with respect to payment amounts, blah, blah, blah, blah, blah. That's not what it says. What it says is except as provided in Section 4.9 with respect to, it does not say and with respect to, it says with respect to. And then it goes on to say any holder can enforce the right to payment. Now, then it... But you're saying that Section 4.9 would be meaningless if the following clause just said it applies to any amount. I've spoken to people who draft these clauses and what they said this was intended to pick up as reflected in the parenthetical is the possibility of an amendment down the road to pay principal or excuse me, to pay interest. And what would that be? That would be if Argentina and the holders decided they wanted to cash out the GDP-linked securities and so came up with some kind of arrangement where they're sending out the principal interest? Or you agreed to just pay interest, a set amount of interest as opposed to... To delay a payment or something. Yes, and you could agree to do interest and that's clearly what that's intended to do because it literally, at the end of the clause, it says in the parenthetical as this security may be amended or modified... It's possible to invoke Section 4.9 just as the exception to the notice provision. So if somebody says, well look, Section 4.8 of the Inventor is the notice provision. Section 4.9 is the exception. And so, I'm going to reference Section 4.9 to say, take the exception and apply it to any amount of interest. I think it's important that the reference is to Section 4.9 of the indenture not to, and this is what the plaintiffs are, not to Section 9 of the note which is a different document. So 4.9 of the indenture just talks about and says, notwithstanding 4.8, which then references back to the similar Section 11 provision, the no action clause that's in the indenture. And then it says that you don't have any right to receive. You can only bring a claim, you can't bring a claim for principal interest. No, I understand, but like when we apply  Section 4.9 of the indenture to the GDP linked securities governed by the global security, we are going to modify, you would agree, we're going to modify some parts of Section 4.9. There's a different provision that allows for modifications, right, different definitions about what the securities are and so on. So it's not going to literally apply to the GDP linked securities. So why would it be irrational for somebody to say, all right, take the general principle of Section 4.9 but you don't have to go through the notice provisions and apply it to the payments that are due under the global security. Okay, let's just step back. Section 11 is the no action clause that governs these warrants. 4.9 in the indenture is the exception. All that's in the exception, 4.8 is irrelevant. Section 11 is the relevant clause. 4.9 only references principal and interest. It doesn't reference anything else. So our point is that the exception only covers 4.9, which is principal and interest. It doesn't cover anything else. And these payments... I get that. And in fact, I made that point to Mr. Engler, so I understand it. But what I'm saying is when Section 11 of the global security cross-references Section 4.9 of the indenture, not every provision of Section 4.9 of the indenture is going to literally apply to the GDP linked securities. Even though Section 4.9 does not withstand Section 4.8, you're going to understand it to be an exception to the notice provisions of Section 11. So that's what governs the GDP linked securities. That's absolutely correct. Even though Section 4.9 says, as such, history may be amended or modified pursuant to Article 7, you're going to understand that actually the GDP linked securities can be modified pursuant to Paragraph 22 of the global security. So there's going to be some parts of Section 4.9 that are not going to literally apply under the global security. So why shouldn't we understand that as just kind of invoking the principle that there's a certain kind of claim that is an exception to the notice provisions? The main reason is because, again, the exception is described as 4.9. All that's covered in 4.9 is interest in principle with respect to its language of limitation. And then going beyond all of that, and this is the other side doesn't really talk about, Section 11, on its face, repeatedly talks about how if you want to bring litigation that's going to affect,  or prejudice the rights of other holders, that's clearly what is contemplated by the litigation that's being brought here. You need to go through the trustee. But that provision of Section 11 is analogous to 4.8, is it not? Excuse me? The new action provisions of Section 11 are largely analogous to those in Section 4.8. There are a few changes. There's some changes, but they serve the same function, correct? I disagree slightly. And I think that the securities that we're talking about, these global link notes, and the issues that are being litigated here, the complex calculation issues, and whether Argentina had an obligation to continue doing GDP from 1993 all the way up to 2034, those are issues that are not present in the context of traditional debt securities where there's a specified interest payment that's going to be made. And that's one of the reasons why they should have gone through the trustee as the English plaintiffs did. Alright, I guess here's the issue I keep coming back to. Section 11 of the global securities makes reference to Section 4.9 of the indenture, which is effectively a carve-out to the no-action clause. And I hear what you're saying about how that's all triggered or predicated on there being payments of principal and interest. The carve-out is predicated on principal and interest. Except I've got the global security document that almost nowhere mentions principal and interest, so it just seems like a melody to give it that carve-out. And what you're saying, I get it, is, don't worry, Stella, it's a placeholder that someday we might amend. It just seems so strange to me to have this placeholder, especially when 4.9 has a similar placeholder and you wouldn't suggest that that means 4.9 has no effect. So, it just sounds like what you're saying is they're just out of luck because instead of using the term payment amounts, they use the term any amounts due here under. They're not out of luck. What they should have done was gone through the trustee. That's important to keep in mind here. It's not like anyone said they couldn't bring a claim. It's just how you bring the claim. And these are very sophisticated parties who clearly, you know, and their plaintiffs are people who are constantly betting on the value of securities, particularly from Argentina. So, they knew... Sure, although they weren't involved in the drafting as you tell me they picked it up later on. No, but when you talk to people who are involved in drafting these types of documents, having a provision like this where there's the potential in a GDP note to do an amendment is a standard way to handle it. And again, the exception is the narrowing principle. And what plaintiffs want to do is essentially turn the entire section 11 it becomes meaningless because they can't cite a single thing other than in their brief and this is important. They say, well, you know, there could be an excessive fee claim that maybe the trust would be brought. Well, the Argentina pays the trust. Well, I don't know. Mr. Engler said what about a suit for reformation of the contract or declaratory judgment or other things? Like, why wouldn't they do that? Well, I think that largely what they're seeking here is declaratory judgment in the guise of seeking payment because they want to try to require Argentina to produce documents that no country has ever produced after it's rebased its GDP. Okay? And Judge Presto rejected that theory. What happened on the first motion to dismiss was she looked at the complaint. They were essentially ignoring what was the requirements in the document and were reading an obligation for Argentina to continue to produce GDP data going forward when that's not in the document, not required. The document, in fact, says Well, I didn't get to the argument Mr. Engler was making as to whether it was appropriate for the district court to require the use of the 1993 data officially published even in a complaint that's just kind of saying you need to use 1993 data, right? Yeah, yes. But again, I think look, this is the key issue that's before the court on appeal. The court should decide this issue. If the court agrees with us, well, then it just goes back to we'll just deal with it and we'll see whether they can proceed under that action. We've agreed to stay the tolling of the running of all the time. It was standard practice to have this kind of a clause because of the possibility of altering the terms of the contract. But if the parties were going to modify the contract to authorize            principle and interest, wouldn't they just decide at that point whether to also authorize suits for the immediate recovery of principle and interest? Why would you need to have a provision at the beginning based on the possibility of altering the contract when you alter the contract you can add the additional provisions to the bill? I think this is just a standard way that they were looking at all the different documents and they were trying to make the documents conform across in terms of at least having that exception in there and the potential that there would be an alteration   But as Judge Fehle correctly pointed out, these payments are clearly not principle or interest by any measure, shape, or form. Again, they could have used the word payment amount. They did not use that defined term. That was a point that Judge Press made. I was using payment amount because they invoked section 4.9. I think you would agree that if they didn't say it's provided in section 4.9 and they just said except with respect to the right of any holder of a security to enforce the payment of any amount due here under on any payment date, no holder can bring the suit. That would have been an exception that applies to any They would have a much better case. They would have a much better case. On this particular issue of whether they had an obligation to go through the trustee, they'd have a much better case. But the fact that 4.9 is specifically referenced, that the with respect to language must be viewed as a limitation not an expansion of 4.9, it really takes you to the question whether these payments satisfy or qualify as principle or interest and we don't think they do. Can I ask the same question I asked Mr. Engler? If I'm persuaded at least that you proffered a plausible reading but I think there's ambiguity, what should we do? Look, I'm not aware of any extrinsic evidence that anyone put forward on this issue below. And we don't think that the language is in any way ambiguous. We think the language is clear. We've made arguments now about how these clauses typically work and that sounds in an extrinsic evidence. But that was just asking, I was answering a question as to what the words mean. In order to look to extrinsic evidence, the words have to be ambiguous. I think on the face of this, as Judge Prescott Right, but that's the premise of my question. Judge Prescott also found it unambiguous the other, your way. If we think there's enough ambiguity,  a reading that even if I'm not sure it's the best reading, I think it's available. Plaintiffs have not offered any extrinsic evidence on this point at all. Do they offer extrinsic evidence? You've just said to me, and I believe your colleague has said to me, there just isn't much to the way of evidence there. Doesn't it just go to the jury if they figure out which interpretation of the contract makes more sense to them? No, because this is an issue, first of all, at the threshold whether they can proceed with the case. Do they have to go through the trustee, number one? And number two, if you look... I don't know if there's a burden issue here, but it is a defense to the suit, right? Excuse me? It's a defense to the suit. Well, no, the argument is it's a motion to... We have a claim because they haven't stated the claim because they haven't followed the requirements of the contract in order to bring a claim. And so, if they haven't satisfied the requirements, they have to go and try to do it through the trustee. I think they have the initial burden to establish they can proceed and in their complaints they plead that they could proceed. Then we had discovery, and discovery established they hadn't obtained the consent of the trustee, which was why this was the first argument in our summary judgment motion. And so, when you look at the complaint, it wasn't clear whether they had met the  and then we sought discovery into all their communications related to the security. It was pretty clear there was none with the trustee, and then we moved, and this was the first argument in our summary judgment motion. So, I think ultimately we're left with, again, the language is unambiguous, and that's our position. They haven't proffered any other interpretation other than interpretations based on the language of looking at other documents. And so, I... Extrinsic evidence, isn't it?  like, if we think that the contract standing alone is ambiguous, then other documents that reflect the course of the court are in the record. All that anyone is doing before this court is engaging in, okay, there's section 11 of the global security, there's section 4.9 of the indenture, and then they say,  there's 4.9 of the note, which is a different security than these  other documents. And they say, well, let's look at all the documents and try to make sense of them. That's not something involving extrinsic evidence. That's what judges do all the time in interpreting contracts. I think what you do at the initial consideration is exactly what Judge Prescott said to do, which we did, which was look at the language of section 11, including the language that I focused on, which is, you know, what you can't do, and then that raises the question which you correctly raised,  Mayashi. Well, they can say,  you want payment, but then they want all these other things before you get to  and then their exception certainly swallows the section 11 and all the rules in section 11 about not affecting,  or prejudicing anyone's rights. And that is in here, and at the very end of the clause, it talks about, and if you're going to bring a claim, you've got to do it on an equal, rateable, and common benefit of all holders. So, that's another indication in the text of section 11 that it was intended to be a   first instance. They didn't do that. And the relief they're seeking, whether it's Argentina should continue to publish GDP data to 2034, which has never been done before by any country, that's something that will affect other holders of these securities. These securities pay out to 2034. What this case is about is a payment in 2013. These plaintiffs bought these securities... I think it's never been done before, but of course the contract has a schedule of base case GDP in 1993 prices that goes to 2034. It's not totally unimaginable that you might have to think about 1993 prices in the same  And that's something that countries do all the time. And in this case, and there's been discovery about this, the IMF was pressuring Argentina for several years before it made the change in the year base prices for calculating its GDP going from 93 to 2004. And so that was an important point. When you calculate GDP in 1993, the classic example that's given is you're looking at typewriters versus computers if you've gone back to 1980. So a country's economy is changing all the time. You want the economy to be one that reflects the current economy with all the innovation and the life that the  has. And so the IMF was pressuring      change in  base prices going from 93 to 2004. And so the IMF was pressuring Argentina for several years before it made the decision        we have with the other side, and it's a dispute that I referenced earlier, Wall Street firms recognized this dispute at the same time when this was all going on, that there were two readings of how you could construe the relevant provision, whether it needed to be a one-time adjustment or a  adjustment over time. And the Argentine approach was viewed as the mainstream approach by HSBC, Bank of America, and all the other experts looking at this. There were some who took what was now the plaintiff's view, but, again, you don't need to deal with any of this. I know, but it's in the briefing, so I'm curious about it. So how do you get to that position from the contract language if the contract language says you have to alter the base case GDP for each reference year with an adjustment fraction that refers to such reference year seemingly to refer to each one? So where do you get a one-time adjustment when the contract says you do it for each? Okay. We think our reading of it is correct because it talks about a fraction and it talks about a year, and we think that requires only one change in what's called the overlap year when the data is actually available, which would be the available information in 2013. That being said, and I want to be clear about this, look, I think this  is a    should affirm Judge Preska. We'll go back and deal with the 205 action which is pending. The court should not go down the road of essentially wading into a massive record and dealing with all these other issues. Now, this court has settled practice and preferred practice not to decide all the issues that the district court did not decide on a summary judgment motion. When you have an issue like this, you don't do it. You don't enter the thicket of dealing with all that. Beyond all of that, this is critical. This is critical. There were 361 pages of expert reports on the adjustment provision and how one interpreted it. There were 656 pages of 56.1 statements of disputed facts. I went through over the last several days and had the team look up. We identified 440 disputed factual issues. I wanted to understand the   are saying it says the base case GDP for each reference year by multiplying the base case GDP for such reference year as set forth in the chart above  . We think a fraction means you do it just one time. The fact that the agreement doesn't require Argentina to publish the GDP data to 2034 which would be highly costly and burdensome and something no country has ever done supports Argentina's  In addition there is a provision in the agreement which gets glossed over which is what we call the  effects provision which says all calculations by the ministry are binding on all holders absent of  faith or manifest error. Clearly if there are two interpretations it would not be manifest error for Argentina to adopt one which was the mainstream interpretation of Wall  analysts looking at the GDP like if the court were to say the contract requires one method of  then it would be a manifest error to use a different one. Rest assured people have looked at this language for a long time. We think our interpretation is correct. One can obviously spin out an interpretation that cuts the other way. Part of the issue is for example with respect to the definition of  it requires the denominator which is the J A 2406. It's complicated. The fact you're relying on the outdated GDP there would be no changes if you adopted their view. It would have no economic effect and would be utterly meaningless. I get the economic point but you could contract to measure it that way, right? You could contract to measure it that way. I think the problem here is that the whole purpose of these securities was they went back and looked at the time which was 3% growth rate over 100 years of the Argentine economy. In the actual document it looks at all the GDP going out to 2034 and after 2008 all become 3%. What they're talking about here is an interpretation that would have led to a payment by Argentina even if there was a negative growth in 2008. And their own internal documents talked about the  fact  there was  action clause in this agreement. It's a widely understood provision that the exception cannot swallow the rule and the relief will affect all holders of the securities and under the clear language of the  It's an interest payment because actually people who bought the securities were giving Argentina the use of money and so payments for the use of money are interest. I think that would make sense in the context of a traditional bond. These are not interest  The definition of interest in the  is some right to recover amount of  What happened in 2005 and 2010 was Argentina restructured the debt. They had some notes that were traditional securities where there was principal interest and they restructured it. Then these equity linked notes were made available which don't bear any  to a  Plaintiffs themselves described them as equity linked focused on the holders of the securities and interest in the Argentine economy. They were over this prospectus in connection with the restructuring. JAH46 said they do not represent the right to receive principal or interest only these GDP contingent payments. They were a form of sweetener. You were getting traditional bonds and warrants contingent on the Argentine economy to the people who were the holders of these securities. If you were in the restructuring you got the warrants and  linked notes and traditional securities. There was discussion before about the prevention of the  Our strong view is that Judge Preska had it right in terms of the global security and the no-action clause. We don't think any of these other issues should be addressed by this court. No one has gone through and waited a        that is entirely right. Thank you. Thank you very much. We will hear back from Mr. Englert on rebuttal. Thank you,   Two points on the merits. Number one, the ambiguity provides the answer. My friend said there are pieces going the other way. There is no case of equal dignity going the other way. I haven't read any case of equal dignity going the other way. Second point. With regard to the fine term payment amount. We pointed out in the opening brief why that was wrong. Argentina did not respond. It is not a strong point. With regard to what is covered by a no action clause. In addition to other examples I gave you,      point. Rule 982 of the federal rules of civil procedure requires capacity to be raised. All they had to do was ask the trustee. They didn't need discovery to know this wasn't a trustee action. They should have raised this in the answer to the complaint. The court can reverse on that ground alone. This court did something in a similar procedure in the opposite case. We are right on this issue anyway. It would be even better. Mr. McCarty    of no action clauses is not to bring actions that affect other holders. In statutory interpretation we know no policy is pursued to the ultimate ends. Just saying a purpose not to affect other holders doesn't get him anywhere. He suggested the trustee doesn't support our action.  has made no payments in any year since 2013. That's why the trustee and others have pursued this. With regard to   much of what I would say on the  other     Jeffer brought up  Reinsdorf testimony. This is where you find our reputation. This is rule 56.1 response. More to the point. Courts interpret contracts. Wall Street analysts do not  contracts. It has nothing to do with how the text of the contract and other tools of interpretation apply. It is really simple to understand because of words like each reference year and such reference year. It's simple to  that Argentina's approach cannot be right. GDP securities had never been done before. The fact that Argentina committed itself to  prices up to 2034, the fact that it's unprecedented doesn't mean anything. This is what Argentina had to do to get relief from its debt prices in 2005 and 2010. Thank you. Thank you very much, Mr. Englert. The case is submitted.